**JAMES M. CHAVEZ**
California State Bar No. 255766
Law Office of James M. Chavez
501 W. Broadway, Suite 240
San Diego, California 92101
Telephone: (619) 894-6464
james@jameschavezlaw.com

Attorney for Mr. Jenkins

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

Plaintiff,

v.

**WALLANCE JENKINS,**

Defendant.

CASE NO.: **24CR1373-JAH**

**MR. JENKINS' SENTENCING MEMORANDUM**

## I. INTRODUCTION

Wallace Joseph Jenkins—known to those close to him as Walter—is a 71-year-old Marine Corps veteran who asks this Court to impose the statutory mandatory minimum of 60 months. He does not ask the Court to overlook what he did. He did drive his son Keith to a post office in September 2023, knowing Keith intended to mail methamphetamine. He did, on a separate occasion in February 2024, independently mail a quantity of methamphetamine to an old friend. Those are serious acts, and he accepts responsibility for them.



Mr. Jenkins (left) with fellow Marines

But acceptance of responsibility is not the same as accepting the government's characterization of who Walter Jenkins is. The government seeks 108 months, treating Walter as a knowing partner in a sustained drug trafficking operation. That picture does not survive honest scrutiny of the facts, and the sentence it produces is greater than necessary.

The defense makes two arguments that independently support a sentence of 60 months. First, under USSG § 3B1.2(b), Walter was a minor participant in the conspiracy. Applying the five factors the Guidelines direct courts to consider, Walter was substantially less culpable than the average participant in a methamphetamine distribution conspiracy of this type: he had no proprietary interest in the operation, exercised no decision-making authority, participated in planning not at all, and derived no financial benefit. His involvement was episodic, addiction-driven, and subordinate in every respect to Keith's. A two-level reduction is warranted. Second, even if the Court declines the guidelines adjustment, the factors under 18 U.S.C. § 3553(a) independently compel the mandatory minimum as a variance. Walter's history of military service, severe mental illness, addiction,

age, and deteriorating health, combined with his substantially lesser culpability compared to Keith, make 60 months the sentence that is sufficient but not greater than necessary.

Walter Jenkins is more than his worst acts. He is a Marine who served honorably in Lebanon, came home damaged, and spent the next fifty years fighting mental illness and addiction without the sustained treatment he needed. He is a man who, after completing his last federal sentence in 2014, remained law-abiding for nearly a decade before the gravitational pull of his son's addiction and his own drew him back. He is 71 years old, in serious physical decline, and poses little danger to this community. Sixty months is sufficient.

## II. STATEMENT OF RELEVANT FACTS

The Court is familiar with the offense conduct from the PSR. The defense sets out the facts as they actually appear in the record, including the facts that are unfavorable to Mr. Jenkins, because an accurate account of what happened supports the minor role argument and undermines the government's portrait of a committed trafficker.

### A. The September 2023 Transaction

On September 25, 2023, Walter drove Keith to a USPS office in Chula Vista after the two had crossed the border together. PSR ¶ 12. Keith retrieved drugs from the back seat, wrote the shipping label, paid the postal clerk, and directed the transaction. PSR ¶ 12. Walter went inside, obtained a shipping box. A postal clerk handed Walter tape to secure the box. Walter and Keith then sealed it together. *Id.* That is the full extent of Walter's participation in Keith's conspiracy: he provided a ride and assisted in sealing a package. Two days later, Keith was arrested in Delaware with 805.7 grams of methamphetamine. PSR ¶ 13.

Critically, according to information provided to the Court by Keith, Walter had been urging Keith to stop. He warned his son that the buyer was likely an undercover officer. He told Keith he hated that Keith was using fentanyl. He was

not a partner who wanted the operation to succeed; he was a father watching his son destroy himself, and his pleas were ignored.

**B. The February 2024 Mailing**

On February 5, 2024—nearly five months after Keith's arrest—Walter crossed the border, drove to the same Imperial Beach residence where he and Keith had retrieved drugs before, picked up an envelope, and mailed a package from a USPS office in San Diego. PSR ¶ 15. The package was addressed to "Oujo Electric LLC" in Farmingdale, New Jersey. Id. A warrant search found 137.7 grams of methamphetamine at 99% purity (130.6 grams actual). PSR ¶ 16.

The defense does not minimize the quantity. 137.7 grams is a meaningful amount, and the Court should not be asked to pretend otherwise. What the defense does argue is that the context strips this transaction of the commercial character the government ascribes to it. Walter has represented to counsel that the value of what he sent was approximately $300. The PSR itself records that Walter "sent the package to the friend without the expectation of any payment." PSR ¶ 22. This was not a sale. It was a user sending drugs to another user, at no charge, with no profit motive. That does not make it lawful. It does make it fundamentally different from commercial trafficking.

The recipient's address bore the name of Walter's co-defendant from his 2006 New Jersey federal case, Robert Oujo. PSR ¶¶ 47, 106. That prior case was commercial in character—Walter mailed methamphetamine and traveled across the country to deliver nearly four kilograms for distribution. This was not that. The shared name reflects a personal relationship of more than two decades, not a reconstituted trafficking partnership. The quantity and the absence of any payment make clear that Walter was not rebuilding Keith's business or reviving his own. He was reaching out to an old friend who shared his addiction.

The PSR also notes that on May 19, 2024, an individual texted Walter asking for drugs. Walter responded: "I have pretty much given away all that I'm going to

give away." PSR ¶ 18. The government may read this as evidence of broader distribution. But the word Walter used was "given away"—not sold, not distributed commercially. That language is entirely consistent with the user-sharing-with-users picture the defense presents. It also suggests someone winding down, not operating a going concern.

**C. What the Phone Evidence Shows**

The government seized Walter's phone. A review of the contents revealed no contact between Walter and the undercover agent throughout the investigation. The phone records showed references to drugs, which is unsurprising given that Walter was a heavy methamphetamine user during this entire period. What the records did not show is what one would expect to find on the phone of a regular drug dealer: sustained customer communications, pricing negotiations, supply coordination, or the kind of operational messaging that characterized Keith's device. The phone evidence is consistent with a user, not a trafficker.

**D. The Investigation's Origins**

This investigation was triggered by a tip to the HSI tip line on June 5, 2023. PSR ¶ 4. The tipster alleged, among other things, that Walter and Keith carried handguns and knives and used coded language to coordinate drug movements. PSR ¶ 5. The investigation was proactive and extensive. Phones were seized. Border crossings were surveilled. Walter was subjected to secondary inspection. None of the tipster's specific allegations about weapons were ever corroborated. There is no evidence of guns anywhere in the record. The coded language claim was never substantiated. Walter was never found with contraband at the border despite

multiple crossings.

According to information provided to the Court by Keith, the tipster was Michele Escobedo, Walter's ex-wife. Keith describes a pattern of vindictive behavior by Escobedo following the breakdown of her relationship with Walter: assaulting him and then calling police on him, being arrested herself for scratching his face, and, when Walter began a new relationship, making false accusations just to make crossing the border a nightmare. The defense does not contend that the investigation produced no valid evidence—it did. But the specific claims the tipster



Walter Jenkins with Michele Escobedo (right)

made about weapons were false, and the investigation never found otherwise. The origins of this case are relevant context for assessing the government's characterization of Walter as a dangerous, armed trafficker.

## III. MR. JENKINS QUALIFIES FOR A MINOR ROLE ADJUSTMENT UNDER USSG § 3B1.2(b)

Under USSG § 3B1.2(b), a defendant who was a minor participant in the criminal activity receives a two-level reduction. Application Note 5 provides that subsection (b) applies to a defendant "who is less culpable than most other participants in the criminal activity, but whose role could not be described as minimal." Application Note 3(C) identifies five non-exhaustive factors for the Court to consider in making this determination. Each factor supports Walter's qualification for the adjustment.

The Probation Office declined to apply a role reduction, finding that Walter's actions were "ongoing" and that he "understood the scope and structure" of the activity. PSR ¶¶ 28-30. With respect, that analysis applies the wrong standard. The question under § 3B1.2 is not whether a defendant understood the conspiracy or participated in it on more than one occasion. It is whether the defendant was substantially less culpable than the average participant. Probation did not perform that comparative analysis. The Court should.

*Factor 1: Degree to Which Defendant Understood the Scope and Structure*

Walter understood that Keith was trafficking methamphetamine. He does not claim otherwise. But understanding that a conspiracy exists is not the same as understanding its scope, its customer base, its supply chain, or its financial structure. Keith sourced the drugs, arranged the body carrier, communicated with the undercover agent, and organized the distribution network. PSR ¶¶ 12-13. Walter knew his son was dealing; he did not know, and had no involvement in, the operational details that made the conspiracy work. This factor favors the adjustment.

*Factor 2: Degree to Which Defendant Participated in Planning or Organizing*

Walter participated in planning nothing. Keith arranged every transaction.

Keith identified the source of supply—a Mexican national whom Walter had introduced to Keith, PSR ¶ 13, but who was Keith's commercial contact, not Walter's. Keith hired the body carrier. Keith wrote the shipping label. Keith communicated with buyers. Walter did not plan, organize, or direct any aspect of the conspiracy. This factor strongly favors the adjustment.

*Factor 3: Degree to Which Defendant Exercised Decision-Making Authority*

Walter exercised no decision-making authority in the conspiracy. He did not decide when to ship, what to ship, to whom to ship, or at what price. The one occasion on which he assisted Keith, he was following Keith's direction. Keith made every operational decision; Walter drove a car. This factor strongly favors the adjustment.

*Factor 4: Nature and Extent of Participation, Including Responsibility and Discretion*

The Guidelines are explicit that performing an "essential or indispensable role" is not disqualifying: "Such a defendant may receive an adjustment under this guideline if he or she is substantially less culpable than the average participant in the criminal activity." USSG § 3B1.2, Application Note 3(C). Walter's participation was limited in both duration and nature. His proven direct involvement in Keith's conspiracy consists of one trip to a post office. His independent February 2024 mailing was a separate, non-commercial act involving a personal contact. He had no ongoing customers, no supply arrangements, and no operational continuity. This factor favors the adjustment.

*Factor 5: Degree to Which Defendant Stood to Benefit*

Walter received no financial benefit from any transaction. PSR ¶ 22. The Guidelines note that "a defendant who does not have a proprietary interest in the criminal activity and who is simply being paid to perform certain tasks should be considered for an adjustment." USSG § 3B1.2, Application Note 3(C). Walter was not even paid to perform tasks. He helped his son for free, and sent drugs to a friend

for free. No profit, no salary, no share of proceeds. This factor strongly favors the adjustment.

*The Comparative Analysis*

The average participant in a methamphetamine trafficking conspiracy of this type in the Southern District is someone who is sourcing drugs, directing distribution, communicating with buyers and sellers, and doing so for financial gain. Keith Jenkins exemplifies that profile: criminal history category VI, an unbroken record of drug convictions, organizing a distribution network across multiple states, coordinating importation, and earning proceeds from every transaction. Walter Jenkins does not resemble that profile. He helped once, sent drugs to a friend once at no charge, and walked away with nothing. He was substantially less culpable than his son—the only other identified participant—and substantially less culpable than the average participant in conspiracies of this kind. The two-level adjustment under § 3B1.2(b) should apply.

## IV. THE § 3553(a) FACTORS INDEPENDENTLY SUPPORT A SENTENCE OF 60 MONTHS

Even if the Court declines to apply the minor role adjustment, the statutory sentencing factors under 18 U.S.C. § 3553(a) independently warrant a variance to the mandatory minimum. The Court must impose a sentence sufficient, but not greater than necessary, to comply with the purposes of sentencing. For the reasons below, 60 months satisfies that standard.

### A. Nature and Circumstances of the Offense

The offense is serious. Walter participated in a conspiracy involving significant quantities of methamphetamine. He did so knowingly. The Court should not be asked to minimize those facts.

But the nature and circumstances also include what Walter did not do. He did not source drugs. He did not profit. He did not direct anyone. He did not communicate with the undercover agent. His phone, seized and reviewed by

investigators, showed no evidence of regular dealing activity. Despite a proactive investigation and multiple surveilled border crossings, he was never found in personal possession of controlled substances. The tipster's specific allegations of firearms and coded language were never corroborated. The record paints a picture not of a trafficker who ran a drug business, but of an addict who became entangled in his son's operation and then separately shared drugs with an old friend from his own supply.

**B. History and Characteristics of the Defendant**

1. <u>Military Service and Its Consequences.</u>

Walter enlisted in the United States Marine Corps at 17 to escape a home defined by abuse. He served honorably from 1972 to 1979, achieved the rank of Sergeant, received two meritorious mast commendations, and served in Lebanon from 1978 to 1979. His military service records, submitted to this Court, document his commendations and his honorable discharge. He was medically retired after suffering a psychiatric breakdown during service.




The VA has diagnosed Walter with PTSD and provides compensation for a delusional disorder, both connected to his military service compounding his childhood trauma. He was hospitalized psychiatrically in 1977, twice in 1979, and in 1980. He suffered severe dissociative episodes for nearly a decade following his discharge, losing substantial portions of memory from those years. He attempted suicide three times. Congress has specifically directed sentencing courts to consider military service as part of a defendant's history and characteristics. 18 U.S.C. § 3553(a)(1). Walter's service was genuine, his sacrifice was real, and the damage it

caused has shaped everything since.




Following his release from federal custody in 2014, Walter found a community of fellow veterans through the Patriot Guard Riders, a volunteer organization whose members escort the remains of fallen service members to their final resting place, standing silent watch at military funerals to honor those who served and shield grieving families from disruption. PSR ¶ 47; PSR ¶ 63. Walter rode with the Patriot Guard Riders throughout his years on supervised release and beyond. The photographs submitted to this Court show him in his Patriot Guard vest, saluting at a funeral procession, an American flag mounted to his motorcycle. It is an image worth pausing on: a broken man, damaged by his own service, spending his free hours giving other veterans the dignified sendoff he feared he would never receive himself. His longtime friend Tina Linton told the Probation Office that she hopes Walter will be able to spend his remaining years "riding his motorcycle and volunteering with the Patriot Guard Riders." PSR ¶ 63. That is what this man did with his liberty when he had it. It is what he wants to do again.

2. <u>Childhood Trauma.</u>

Walter's childhood was an education in abuse. His father was physically violent and sexually deviant. His mother, herself orphaned at four when her father

murdered her mother, subjected Walter to cruel and sometimes degrading punishment. The family moved constantly; Walter had no stable community and no lasting friendships. He ran away at 12, spent two days hiding in a chicken coop with nowhere to go, and returned because he had no alternative. The trauma he carried into the Marines had already been years in the making.

3. Severe Mental Illness.

Walter has carried serious mental illness for more than 50 years. His conditions include PTSD (diagnosed 1994), severe recurrent depression with multiple suicide attempts, and a VA-compensated delusional disorder. His medical records, including those from the Mayo Clinic, document the severity of these conditions across decades. Untreated and undertreated psychiatric illness is a recognized driver of the kind of substance abuse and impaired judgment that brought Walter before this Court. His addiction to methamphetamine was not recreational; it was self-medication by a man in chronic psychological pain.

4. A Decade of Law-Abiding Conduct Before This Offense.

After completing his 145-month federal sentence in 2014, Walter remained crime-free for nearly a decade. PSR ¶ 47. He reported as directed to supervision, participated in drug and mental health treatment, and joined a veterans' motorcycle club. PSR ¶ 47. His relapse into drug use began around 2018 after a destructive relationship. Id. His criminal history category is II—one prior federal drug conviction for which he served a substantial sentence. Compare that to Keith, whose criminal history category was VI with an unbroken record of convictions spanning his adult life. The contrast matters. Walter demonstrated, for ten years after his release, that he was capable of living lawfully. Keith never had a comparable period of stability. This history does not excuse the offense, but it substantially undermines any claim that Walter is an incorrigible recidivist who requires extended incapacitation.

5. Physical Health Deterioration.

Walter is 71 years old and in serious physical decline. He is 100% blind in his left eye, has glaucoma in his right eye, suffers significant hearing loss requiring assistive devices, has an enlarged prostate of 20 years' duration, high blood pressure, irritable bowel syndrome, asthma, and arthritic conditions affecting his mobility. Incarceration imposes substantially greater hardship on a defendant in this condition, and this Court may appropriately weigh that hardship in fashioning a just sentence.

**C. Seriousness of the Offense, Respect for the Law, and Just Punishment**

The mandatory minimum of 60 months is not a slap on the wrist. It is five years in federal custody for a 71-year-old man in deteriorating health. He will likely be released, at the earliest, in his mid-seventies. That is a serious consequence, and it is a proportionate one given the actual conduct: one act of assistance to his son and one non-commercial transfer to an old friend. The guideline range—calibrated for active, profit-motivated traffickers who direct operations and bear primary responsibility for the harm caused—substantially overstates the seriousness of Walter's specific conduct.

**D. Deterrence and Protection of the Public**

Sixty months amply serves both general and specific deterrence. As to specific deterrence: Walter is 71, in declining health, with no history of violence in the past three decades and no indication he was operating as a commercial dealer. The public does not need 108 months to be protected from Walter Jenkins.

**E. Avoiding Unwarranted Sentencing Disparities**

Keith Jenkins—the architect of the conspiracy, criminal history category VI, who organized distribution across multiple states, hired a body carrier, communicated directly with the undercover agent, and earned proceeds from every deal—received 130 months. The government asks this Court to sentence Walter,

who drove a car once and mailed a package to a friend, to 108 months. That is a gap of only 22 months between the organizer and the man who helped once. Sentencing Walter to 108 months would not avoid an unwarranted disparity; it would create one. The mandatory minimum of 60 months appropriately reflects the real difference in culpability between these two men.

## V. CONCLUSION

Walter Jenkins enlisted in the Marines at 17 to escape a childhood of violence and neglect. He served his country, came home broken, and spent the next fifty years struggling with the consequences. He completed his last federal sentence and then, for nearly a decade, lived without incident. When his son's addiction and his own pulled him back, the conduct he engaged in was serious—but it was the conduct of a damaged addict helping another addict, not a professional trafficker building an enterprise.



Applying USSG § 3B1.2(b), Walter qualifies for a two-level minor role reduction as a defendant who was substantially less culpable than the average participant in this conspiracy. Even without that adjustment, the 18 U.S.C. § 3553(a) factors—his military service and its lasting damage, his severe mental illness, his age, his health, his decade of law-abiding conduct, and his substantially lesser culpability compared to Keith—independently support a variance to the mandatory minimum.

Mr. Jenkins respectfully requests that this Court impose a sentence of 60 months' imprisonment, followed by four years of supervised release, with a strong recommendation for RDAP participation and comprehensive mental health treatment

Respectfully submitted,

Dated: March 5, 2026

*s/ James M. Chavez*
Attorney for Mr. Jenkins

# Letter from Keith Jenkins

**TO:** Judge Houston
**FROM:** Keith Jenkins, son of Wallace Jenkins
**RE:** The involvement of Wallace Jenkins in the narcotics case of Keith Jenkins
**DATE:** January 13, 2026

Thank you Your Honor for taking time to read this letter. I know your time is valuable so I will make this as short as i can and get to the point.

In 2023, I was a desperate and hopeless meth and fentanyl addict living in Mexico. My addiction was terrible. I was 5 foot 10 and only weighed 138 pounds at the time of my arrest and I was in and out of the hospital with pneumonia.

On a trip visiting my mother in Delaware, her neighbor turned me on to a customer saying the guy wanted to buy an ounce of meth which I sold him. I told him I could get him anything because I was broke and needed money. Awhile later the man contacted me and wanted me to send him 3 pounds of meth and some fentanyl pills. He said he would send me 10 thousand dollars, cash up front.

I told my father about this and he was stressed. He told me that nobody would send someone they only met once 10 thousand dollars up front for drugs. He pleaded with me saying this guy, Donny was his name, had to be an undercover cop. My father did not want me going back to prison yet again and he absolutely hated me dealing in or using fentanyl. I was making him distraught because I was killing myself with opiates and he lost his other son, my brother Wally in 2004 due to a heroin overdose. All of his common sense fell on deaf ears. I

was very desperate for the cash and went ahead with the deal.

When the money arrived at my P.O. Box I was very anxious. I didn't really know where to get 3 pounds of meth. I was a small-time dealer, selling an ounce here and there to help support my habit. I first attempted to buy 3 pounds in San Diego and was robbed for $2,800 dollars. Days past, my health was declining from constantly smoking fentanyl and meth. My lungs where full of fluid, my mental state was terrible, I was overdosing on a regular basis and I was late by a couple days on sending 10 thousand dollars' worth of drugs to a man I thought was drug dealer and I was in a state of panic.

I sent Donny an empty box just to buy time. I needed to send him a tracking number. I wound up in the emergency room with pneumonia at about the same time the empty box was to arrive in Delaware so I texted Donny, the undercover cop, out of complete desperation and told him don't worry please, my dad will help me. I told him I would have my dad call him and if needed I would have him send the package. None of this was true. I often told Donny I had a partner to seem more legit. He told me he had a partner and me, trying to seem less pathetic, mirrored him on this.

At this point I had been living in Mexico about a year. I was a mess. Honestly, I was a strung-out junky, not a king-pin drug-dealer and whenever I needed anything like something to eat, a place to stay or a ride to the hospital I called my father. He was always there for me, cared for me and loved me tremendously. So, when problems happened, like this mess with Donny, the first thing that came to mind was to say that dad would help.

But I never asked him for help on this. It is known that my father never called the undercover agent or sent any of my packages. I checked out of the hospital the following day. I met a dealer through my girlfriend in Mexico who also had a mule working for him, a woman to move the drugs across the border so I was able to complete my business with Donny.

It was not until my last deal that I needed any help from my father. I had 2 pounds of meth delivered to me by the mule in San Diego. Two days later I needed to retrieve the meth, go mail it to Delaware, then catch a plane. I asked my father for a ride to do all of this. He complied out of complete pity for his son.

Your Honor, I plead with you Sir to consider before sentencing my father that he was not involved in making any of the deals that I was convicted of. He did not purchase any of the narcotics I was charged with. He had nothing to do with moving any of the drugs across the border and they know from surveillance that it was me who sent the packages. Also, my father did not profit anything from my drug deals. He is obviously no saint but my deals were all my doing.

I would also like to say that growing up with my parents at times was difficult. It is true that my parents gave me drugs and I was punished to my room a lot. But I never felt that my parents didn't care about me. My father cared about me and loved me but he was mentally ill. My first memories of him were visiting him in a mental institute in Virginia. When he came back from Lebanon, serving his country he was damaged. Horrible things happened to him over there. Also, his parents were terrible people, especially his father who was a sexual deviant and had a bizarre upbringing. My

point is that he did the best he could with me and I love him dearly.

And finally, I would like to mention hi ex-wife Michele. My father did nothing but help her; for years he completely supported her. She was and is completely psychotic. Several times she called the police on him after she assaulted him resulting in getting arrested herself for scratching up his face. He divorced her but against any rational thinking continued to help her. When he started to date another woman, she went out of her way to hurt him even smearing her own feces on his car windshield. She said a lot of things that at least at the time were not true just to make crossing the border a nightmare.

My father is a good man with a big heart and all I can hope for is to see him again and hope he doesn't die in prison. Please have mercy on him Judge Houston and thank you for your patience in reading my letter

Sincerely:

Keith Jenkins

# Documents from VA file

Genelle Young 11-17-8_ J

MEDICAL BOARD REPORT COVER SHEET
NAVMED 6100/1 (Rev. 1-7?)

PREPARATION INSTRUCTIONS SEE MANMED ARTICLE 18-24 391478 dad

1. FROM MEDICAL BOARD, NAVAL REGIONAL MEDICAL CENTER, PORTSMOUTH, VIRGINIA
TO CENTRAL PHYSICAL EVALUATION BOARD
VIA CO, NAVREGMEDCEN, PORTSMOUTH, VA.

2. NAME (LAST, FIRST, MIDDLE INITIAL) JENKINS, Wallace J.
3. DUTY STATION MARINE BARRACKS, YORKTOWN, VIRGINIA
4. SOCIAL SECURITY NO. 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
5. SEX/RACE M/CAUCASIAN
6. DATE OF BIRTH 26 NOVEMBER 1954
7. LENGTH OF SERVICE 05 years 00 months
8. GRADE/RATE SGT
9. BRANCH USMC
CAUSE OF INJURY NA
10. MILITARY THEATER OF OPERATIONS NA

11. MEMBER'S STATUS (CHECK ONE)
[ ] 1 ACTIVE DUTY NAVY
[ ] 2 ACTIVE DUTY NAVY RECRUIT
[XXX] 3 ACTIVE DUTY MARCORPS
[ ] 4 ACTIVE DUTY MARCORPS RECRUIT
[ ] 5 OTHER

12. DATE AND PLACE OF ENTRANCE PHYSICAL EXAMINATION
DATE
PLACE

13. ORIGIN OF CONDITION (CHECK ONE)

14. ADMITTED TO ____LIST
[XXX] 1 Yes
[ ] 2 No
DATE OF ADMISSION 21 MARCH 1979
DATE OF ____

16. INDICATED DISPOSITION (CHECK ONE)
[XXX] 1 REFER TO CENTRAL PEB
[ ] 2 DISCHARGE PHYSICAL DISABILITY
[ ] 3 DISCHARGE ENLISTED IN ERROR
[ ] 4 DISCHARGE CONVENIENCE OF GOV'T
[ ] 5 DISCHARGE UNSUITABLE FOR SERVICE
[ ] 6 RETURN TO FULL DUTY
[ ] 7 RETURN TO LIMITED DUTY
[ ] 8 DEPARTMENTAL REVIEW OR OTHER

____ MEMBERS REBUTTAL

18A PRIMARY DIAGNOSIS
PARANOID STATE, DNEPTE #2979

18B SECOND DIAGNOSIS
LEFT TEMPORAL DYSRHYTHMIA, GRADE II DATE OF ONSET UNKNOWN ##7817

18C THIRD DIAGNOSIS

18D FOURTH DIAGNOSIS

19 REMARKS
ENCL: COPY OF MESSAGE TO COMNAVMILPERSCOM

| 20 | BOARD MEMBERS | GRADE/CORPS | SERVICE | SIGNATURE |
|---|---|---|---|---|
| Senior Member | J. L. STAIGER | CDR MC | USN | [signature] |
| Member * | M. MCALLISTER | LT MC | USNR | [signature] |
| Alternate Member | | | | |

DATE 29 JUN 1979

21 FIRST ENDORSEMENT
FROM CONVENING AUTHORITY
TO CENTRAL PHYSICAL EVALUATION BOARD, NAVAL COUNCIL OF PERSONNEL BOARDS
VIA ARLINGTON, VIRGINIA 22209

1. INDICATED DISPOSITION OF THE MEDICAL BOARD IS APPROVED. DISCIPLINARY ACTION OR ADMINISTRATIVE INVOLUNTARY SEPARATION ACTION IS NOT PENDING.

2. RETAINED AS A PATIENT PENDING PHYSICAL EVALUATION BOARD PROCEEDINGS.

[signature]
SIGNATURE
H. JAMES T. SEARS
By direction

S/N 0105-LF 208 1001

Genelle Young 11-17-8[illegible] J

THIS IS AN IMPORTANT RECORD SAFEGUARD IT.

1. LAST NAME - FIRST NAME - MIDDLE NAME: JENKINS, WALLACE [illegible]

2. SEX: M

3. SOCIAL SECURITY NUMBER: 154 [illegible] 2115

4. DATE OF BIRTH: YEAR 54 MONTH 11 DAY 26

5. DEPARTMENT, COMPONENT AND BRANCH OR CLASS: USMC-11

6a. GRADE, RATE OR RANK: SGT

b. PAY GRADE: E5

7. DATE OF RANK: YEAR 76 MONTH 06 DAY 01

8a. SELECTIVE SERVICE NUMBER: 28 035 54 [illegible]

b. SELECTIVE SERVICE LOCAL BOARD NUMBER, CITY, STATE AND ZIP CODE: [illegible] NJ 08723

c. HOME OF RECORD AT TIME OF ENTRY INTO ACTIVE SERVICE (Street, RFD, City, State and ZIP Code): 400 D LAUREL BROOK DRIVE BRICKTOWN, OCEAN NJ 08723

9a. TYPE OF SEPARATION: TEMPORARILY RETIRED

b. STATION OR INSTALLATION AT WHICH EFFECTED: RUC 20010 [illegible], CAMP ELMORE, NORVA 23511

c. AUTHORITY AND REASON: RFK1

d. EFFECTIVE DATE: YEAR 79 MONTH 09 DAY 07

e. CHARACTER OF SERVICE: HONORABLE

f. TYPE OF CERTIFICATE ISSUED: [illegible]

10. REENLISTMENT CODE: RE-3B

11. LAST DUTY ASSIGNMENT AND MAJOR COMMAND: SUPTCO, CAMP ELMORE, NORVA 23511

12. COMMAND TO WHICH TRANSFERRED: N/A

13. TERMINAL DATE OF RESERVE/MSS OBLIGATION: YEAR MONTH DAY — NONE

14. PLACE OF ENTRY INTO CURRENT ACTIVE SERVICE (City, State and ZIP Code): JACKSONVILLE, NC 28542

15. DATE ENTERED ACTIVE DUTY THIS PERIOD: YEAR 77 MONTH 06 DAY 03

16a. PRIMARY SPECIALTY NUMBER AND TITLE: 2531 RADIO MAN

b. RELATED CIVILIAN OCCUPATION AND D.O.T. NUMBER: N/A

17a. SECONDARY SPECIALTY NUMBER AND TITLE: N/A

b. RELATED CIVILIAN OCCUPATION AND D.O.T. NUMBER: N/A

18. RECORD OF SERVICE

| | YEARS | MONTHS | DAYS |
|---|---|---|---|
| (a) NET ACTIVE SERVICE THIS PERIOD | 02 | 03 | 04 |
| (b) PRIOR ACTIVE SERVICE | 03 | 11 | 06 |
| (c) TOTAL ACTIVE SERVICE (a + b) | 06 | 02 | 10 |
| (d) PRIOR INACTIVE SERVICE | 00 | 00 | 00 |
| (e) TOTAL SERVICE FOR PAY (c + d) | 06 | 02 | 10 |
| (f) FOREIGN AND/OR SEA SERVICE THIS PERIOD | 00 | 00 | 00 |

19. INDOCHINA OR KOREA SERVICE SINCE AUGUST 5, 1964: ☐ YES ☒ NO

20. HIGHEST EDUCATION LEVEL SUCCESSFULLY COMPLETED (In Years): SECONDARY/HIGH SCHOOL 10 YRS (1-12 grades) COLLEGE 00 YRS

21. TIME LOST (Preceding Two Yrs): NONE

22. DAYS ACCRUED LEAVE PAID: DUE NOT SETTLED

23. SERVICEMEN'S GROUP LIFE INSURANCE COVERAGE: ☐ $15,000 ☐ $5,000 ☒ $20,000 ☐ $10,000 ☐ NONE

24. DISABILITY SEVERANCE PAY: ☒ NO ☐ YES AMOUNT N/A

25. PERSONNEL SECURITY INVESTIGATION: a. TYPE ENTNAC b. DATE COMPLETED 730803

26. DECORATIONS, MEDALS, BADGES, COMMENDATIONS, CITATIONS AND CAMPAIGN RIBBONS AWARDED OR AUTHORIZED

NATIONAL DEFENSE SERVICE MEDAL, MERITORIOUS MAST
EXPERT MARKSMANSHIP BADGE - (3RD AWARD)
GOOD CONDUCT MEDAL (2ND AWARD)

27. REMARKS

GOOD CONDUCT MEDAL PERIOD COMMENCES 790628 (3RD AWARD)
SMN REQUEST HIS COPY OF DD FORM 214(MC)
MEMBER UNAVAILABLE FOR SIGNATURE.
SMN HOME AWAITING FINAL DISPOSITION WHEN FORM WAS PREPARED.

28. MAILING ADDRESS AFTER SEPARATION (Street, RFD, City, County, State and ZIP): SEE ITEM 8c

29. SIGNATURE OF PERSON BEING SEPARATED: SEE REMARKS

30. TYPED NAME, GRADE AND TITLE OF AUTHORIZING OFFICER: [illegible], LTCOL, COMMANDING OFFICER

31. SIGNATURE OF OFFICER AUTHORIZED TO SIGN: [signature]

DD FORM 214 MC — PREVIOUS EDITIONS OF THIS FORM ARE OBSOLETE. — THIS IS AN IMPORTANT RECORD SAFEGUARD IT. — REPORT OF SEPARATION FROM ACTIVE DUTY (1900)

S/N 0102-LF-000-0001

Genelle Young 11-17 J



B. Hundley 79510

12

# United States Marine Corps

*This is to certify that*

PFC H.J. JENKINS 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 USMC

*has completed the course prescribed by the Commandant of the Marine Corps for*

FUNDAMENTALS OF MAP READING 03,43A

*given at*

## Marine Corps Institute, Washington, D.C.

*this* 13 *day of* NOVEMBER, *19* 74

J. A. Lane
*Assistant Registrar, Marine Corps Institute*

C. G. Cooper
*Director, Marine Corps Institute*

NAVMC 184-MCI (8-67)

B. Hundley 79510

12

# United States Marine Corps

*This is to certify that*

CPL W J JENKINS 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 USMC

*has completed the course prescribed by the Commandant of the Marine Corps for*

FUNDAMENTALS OF MAP READING 0343C

*given at*

**Marine Corps Institute, Washington, D.C.**

*this* 06 *day of* JANUARY, 1976

J. A. Lane

*Registrar, Marine Corps Institute*

*Director, Marine Corps Institute*

A5

NAVMC 184-MCI (8-67)



B. Hundley 79510

12

# United States Marine Corps

*This is to certify that*

CPL W.J. JENKINS 154482315 USMC

*has completed the course prescribed by the Commandant of the Marine Corps for*

VHF /FM/ FIELD RADIO EQUIPMENT 25.30A

*given at*

**Marine Corps Institute, Washington, D.C.**

*this* 24 *day of* MAY, 19 76

*Director, Marine Corps Institute*

NAVMC 154-MCI (3-67)

A6



B. Hindley 79510

12

United States Marine Corps

# Certificate of Good Conduct

CORPORAL WALLACE J. JENKINS [illegible] USMC

*Having conducted yourself in a creditable manner, you are, by direction of the Commandant of the Marine Corps, awarded a Good Conduct Medal*

First Award *for the period*

26 June 1973 *to* 27 June 1976

*Your conduct during this period denotes honest and faithful service in keeping with the highest traditions of the Marine Corps.*

J. F. Monahan
U.S.M.C.
Lieutenant Colonel
COMMANDING

[illegible]
FPO New York [illegible]
UNIT
1 August 1976
DATE OF AWARD



B. Hundley 79510

12

United States Marine Corps

# Certificate of Good Conduct

CORPORAL WILLIAM J. JENKINS [illegible]

*Having conducted yourself in a creditable manner, you are, by direction of the Commandant of the Marine Corps, awarded a Good Conduct Medal*

First Award *for the period*

28 June 1973 *to* 27 June 1976

*Your conduct during this period denotes honest and faithful service in keeping with the highest traditions of the Marine Corps.*

J. P. [illegible]
U.S.M.C.

Lieutenant Colonel

[illegible]

Camp Lejeune, N. C. [illegible]

[illegible] August 1976

B. Hundley 79510

12

A11



United States Marine Corps

Sgt W. K. JENKINS, 154 48 21 15

was on the Twenty-second day of February, 1977,

the subject of a

MERITORIOUS MAST

conducted by the

COMMANDING GENERAL
12th Marine Amphibious Brigade FMF
Camp Lejeune, North Carolina 28542

for outstanding service as follows:

During ALPINE WARRIOR 77 and while deployed to Fort Drum, New York, a severe winter blizzard, which has been identified as the worst storm in recorded history of that area, hit and paralyzed the surrounding communities. Disaster relief was requested of the 12th Marine Amphibious Brigade. Your outstanding performance as a member of the working parties utilized to assist in the extrication of a populace which was in extremis is commendable. You expended great effort, devoting long hours, extending into darkness, under extreme weather conditions, to ensure that the roofs of the schools of the Village of Adam, New York did not collapse from the weight of eight feet of snow. The humanitarian aspects of this involvement, coupled with the camaraderie established with the people is in keeping with the highest standards of excellence of the United States Marine Corps.

Well done Marine.

F. W. TIEF
Commanding General

NAVMC 10066 (6-73) SN: 0000-00-006-0980 U/I: 25 SHTS PER PD

# Letters of support from friends

To the Honorable Judge Houston

I am writing this letter to provide a character reference for Wallace Jenkins, whom I have had the privilege of calling my best friend for the past 25 years. Throughout our long-standing friendship, I have witnessed many facets of Wallace's character, and I can unequivocally say that he is a person of profound generosity and kindness.

Our bond was solidified during our time in trade school, where Wallace's unwavering support and companionship played a crucial role in both my personal and professional development. Wallace has not only been a steadfast friend to me, but he has also extended his generosity to my wife and many others over the years. His selflessness and readiness to help those in need have been a constant, defining feature of his character.

While I am aware of the charges facing Wallace and the circumstances that have led to this situation, I believe it is important to present a broader perspective on his character. Wallace has occasionally found himself caught up in unfortunate situations, but these instances do not overshadow the positive impact he has had on those around him.

I hope this letter serves to illustrate the other side of Wallace Jenkins – the side marked by his generosity, kindness, and unwavering support for his friends and community. His actions over the years have demonstrated a genuine care for the well-being of others, and it is this quality that I earnestly wish to highlight.

I look forward to his eventual release when we can ride bikes once more.

Sincerely,

Dennis Hanafin

To the Honorable Judge Houston

I am writing to provide a character reference for Wallace Jenkins, whom I have had the pleasure of knowing for 23 years. I first met Wallace because he is my husband's best friend, and over the years, he has grown to be a cherished part of our family.

Wallace has always been a gentleman with a heart of gold. He frequently joined us for holiday dinners, and we consider him to be an integral member of our family. Wallace's kindness and willingness to help others are qualities that have always stood out to me.

In May 2024, Wallace was arrested at the Mexican border due to a warrant implicating him in his son Keith Jenkins's case. As a father, Wallace allowed Keith to reside with him and use his post office box. On one occasion, he drove Keith to the airport to visit his mother who resides out of state. Wallace had two sons, but tragically, one passed away 22 years ago. His compassion and dedication to his family are evident in his decision to support Keith during challenging times.

Wallace's nature is to help anyone in need, and his commitment to serving others extends beyond his family. He is and always will be a marine, having served 12 years in the military. In his retirement, he became a Patriot Guard Rider to honor the families of the US military. His participation in a news segment regarding the Patriot Guards showcased his deep respect for those who have served our country.

Wallace will be 71 this November, and he wishes nothing more than to live out his golden years peacefully. His character, dedication to his family, and service to his country are qualities that speak volumes about the kind of person he is.

Sincerely,

Tina Linton